**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESUS RODRIGUEZ SANDOVAL;
ADRIANA RODRIGUEZ, individually
and as Guardian Ad Litem for Kenya
Rodriguez, a Minor; HENRY BRIAN
RODRIGUEZ; MARTHA LEAL, as
Guardian Ad Litem for Jordhy Leal,
a Minor; MONICA MORENO, as
Guardian Ad Litem for David
Madueno, a Minor,
    *Plaintiffs-Appellants*,

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT; CLARK COUNTY,
NEVADA; JAY R. ROBERTS, Sgt.;
MICHAEL DUNN, Officer;
CHRISTOPHER G. KOHNTOPP,
Officer; JUSTIN BYERS, Officer;
TROY GIVENS, Officer,
    *Defendants-Appellees*.

No. 12-15654

D.C. No.
2:10-cv-01196-
RCJ-PAL

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
October 17, 2013—San Francisco, California

Filed July 1, 2014

Before: Sidney R. Thomas and M. Margaret McKeown, Circuit Judges, and Virginia M. Kendall, District Judge.[*]

Opinion by Judge McKeown

## SUMMARY[**]

### Civil Rights

The panel reversed in part and affirmed in part the district court's summary judgment and remanded in an action brought pursuant to 42 U.S.C. § 1983 and Nevada state law alleging that Las Vegas Metropolitan Police officers violated plaintiffs' constitutional rights when they entered, without a warrant, plaintiffs' home looking for intruders, handcuffed and detained the teenage boys inside, and shot and killed the family dog.

Reversing the district court's summary judgment in favor of the police officers, the panel held that taken in the light most favorable to plaintiffs, officers did not have probable cause to enter and search the residence for either evidence of burglary or the lesser offense of prowling. The panel held that police officer Michael Dunn was not entitled to qualified

---

[*] The Honorable Virginia M. Kendall, District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

immunity because it was clearly established law as of 2009, that the warrantless search of a dwelling must be supported by either the exigency or the emergency aid exception. The panel further held that officers were not entitled to qualified immunity on plaintiffs' excessive force claim and were not entitled to Nevada statutory immunity on certain state law claims for intentional infliction of emotional distress, assault and battery and false imprisonment.

Affirming the district court's summary judgment in favor of the police officers on plaintiffs' claim for deprivation of familial association, the panel held that a separation between a father and his son for forty minutes did not shock the conscience and that the shooting of the family dog did not fall within the ambit of deprivation of a familial relationship. The panel further determined that there was no evidence of an equal protection violation and that plaintiffs' bare-bones allegations of municipal liability were insufficient.

---

## COUNSEL

E. Brent Bryson (argued), Ales & Bryson, Las Vegas, Nevada, for Plaintiffs-Appellants.

Craig R. Anderson (argued) and Joshua L. Benson, Marquis Aurbach Coffing, Las Vegas, Nevada, for Defendants-Appellees.

**OPINION**

McKEOWN, Circuit Judge:

This appeal arises out of the events of October 24, 2009, when the Las Vegas police, on the lookout for two white males, mistook a teenaged boy and his friends, all Hispanic, for intruders in the boy's own home. In the course of the afternoon, police pointed guns at the boys, entered the home without a warrant, handcuffed and detained the boys and others, and shot and killed the family dog. The family ("the Sandovals"[1]) brought suit against the police, alleging violations of their constitutional rights and related rights under state law. The district court granted summary judgment to the police department and the officers on all claims. We reverse the judgment on the Fourth Amendment claims for excessive force and unlawful entry and on certain of the state law claims, and affirm the judgment on the remaining claims.

**BACKGROUND**

On October 24, 2009, the Las Vegas Metropolitan Police Department ("LVMPD") received a 911 phone call from a witness, Albert Schouten ("Schouten"), who said that he saw two white males between ages 18 and 20, one carrying a skateboard, jump a fence and start looking through the

---

[1] Although not all of the plaintiffs-appellants are related, at times we refer to them, for clarity, collectively as "The Sandovals." This group includes Jesus Rodriguez Sandoval, the father; Adriana Rodriguez, the mother, individually and as *guardian ad litem* for their eleven-year-old daughter, Kenya; Henry Brian Rodriguez, their eighteen-year-old-son; Martha Leal, as *guardian ad litem* for Jordhy Leal, her sixteen-year-old son; and Monica Moreno, as *guardian ad litem* for David Madueno, her fifteen-year-old son.

windows of a house in the neighborhood. There had been a recent pattern of youths burglarizing homes in the area.

Sergeant Roberts and Officer Dunn of the LVMPD, and later several of their colleagues, responded to the call, and arrived at the residence of Jesus Sandoval, Adriana Rodriguez, and their children.[2] The officers entered the yard and saw open windows, doors, and gates, consistent with residential use, but did not identify any point of entry indicators suggesting a burglary.

Roberts looked through an open bedroom window and saw "three young males" who were "younger than 18 to 20," and were "about 14, 15."[3] Roberts conceded that the boys—Henry, then 18, who lived at the house, and his two friends, David, then 15, and Jordhy, then 16— "did not match" two of the three metrics that Schouten had given him: the number of suspects or the age of the suspects. As to race, Roberts agreed that the suspects, who were Hispanic, were "not the color of a white person that you typically think of as being white," and that "[w]hen [he] saw them for the first time [he] thought they were either dark-skinned white males or Hispanic." Two of the boys later testified that they had never before been

---

[2] On arrival, Roberts spoke with Schouten. There are no records of that conversation, but in a statement to the police after the incident, Schouten reported that before the officers arrived, "[t]he subject with the skateboard came back over the fence and walked to [a different street] and was picked up by a maroon SUV." The police report noted that one subject was "H," meaning, according to Roberts, "gone on arrival, meaning . . . the guy . . . can't see him anymore."

[3] Roberts later contradicted this testimony and said that they "looked like they could be 18 to 20," but also testified several times that the boys did not match Schouten's description of their age.

described as white or confused for a white person. The boys were listening to music, watching TV, and playing video games.

Roberts did not ask the boys any basic identifying questions. Instead, Roberts pointed his gun at the head of one of the boys through the bedroom window, and gave the boys conflicting commands, telling them "don't move," "[l]et me see your hands,"and "turn the music down." Roberts told Jordhy to turn down the music, which Jordhy tried to do, and then told him, "I told you don't move, I could shoot you" or "I'll f***ing shoot you." Roberts testified that the boys did not comply with his commands at this stage, but that they complied at all later stages. The boys, to the contrary, testified that they followed the officers' commands at this point and throughout the events that followed. Henry, for example, reported that when Roberts appeared in the window, the boys "all froze," that they "didn't move," and that he "didn't want to risk moving at all." Roberts acknowledged that the boys may not have heard certain of his commands.

Roberts's colleague, Dunn, entered the house through the sliding glass door. Dunn, who could not see the boys, observed his partner pointing a gun and giving commands to someone through the window. He said that he entered the house because he thought that Roberts "could not control the suspects," since he heard Roberts issue commands more than once and heard the tone of Roberts's voice change. As Dunn entered the house, he began giving commands at the same time as Roberts, and recognized that this could have created confusion.

Roberts ordered the boys to exit the bedroom. Henry asked to be allowed to put away the family dog, Hazel, a pit

bull, before letting the officers into the home, but Roberts did not allow him to do so.

As the boys exited the bedroom, Hazel slipped in front of Henry and Jordhy, but continued to walk behind David, according to David's testimony. Dunn shot Hazel in the face, twelve inches from David, and in the direction of Henry and Jordhy. The officers ordered David and Jordhy to the floor, handcuffed them, and brought them outside. Henry was ordered outside, but was not cuffed until later, as he was carrying Hazel, who was bleeding to death. The boys testified that the handcuffing and other treatment by the officers caused them pain.

Only after the boys were cuffed and exiting the house did the officers begin to make their first inquiries as to the boys' right to be in the home.

Henry called his father, Jesus Sandoval ("Sandoval"), and told him that the police had entered the home and shot Hazel. Henry also asked an officer to call the animal hospital, but the officer said, "if you don't shut the f*** up, I'm going to let your dog die right there." Sandoval rushed home with his twelve-year-old daughter, Kenya, and found two of the boys handcuffed on the lawn, a swarm of officers and patrol cars, and Henry, covered in Hazel's blood. Sandoval, who was walking with a cane because of back surgery fifteen days earlier, thought his son had been shot, and tried to go to him. When officers told him he could not enter the property, he became upset. Roberts ordered officers to handcuff Sandoval.

As the officers pushed Sandoval against a squad car, Sandoval said, "please don't do this . . . I had a back surgery about 15 days ago. . . . I had major back surgery." The

officers grabbed Sandoval's arm to handcuff him, "pull[ed Sandoval] up by the arm," and, "holding [Sandoval] from [his] belt or [his] pants," "pushed" or "threw" Sandoval inside the patrol car. Sandoval began "screaming" that he was in "severe pain" and that he needed his medication. Sandoval was detained in the patrol car for 25 to 30 minutes, still "screaming . . . in pain," before officers responded to his requests for medication. Kenya witnessed all of these events.

When Animal Control arrived at the house, Henry ran to the truck and placed Hazel inside. Henry was immediately handcuffed by the police and was detained in the back of a patrol car for 30 to 40 minutes. Soon afterwards, Hazel died.

None of the family members or the boys were cited or charged with any crime, and Dunn testified that the boys committed no crime. The officers eventually "just left." Dunn admitted that if he or Roberts had asked basic identifying questions, the entire incident would not have happened.

The Sandovals brought suit under 42 U.S.C. § 1983 against the LVMPD and several officers, including Roberts and Dunn, in their individual and official capacities. They alleged violations of their Fourth, Fifth, and Fourteenth Amendment rights to due process, equal protection, freedom from excessive force, freedom from pre-conviction punishment, and familial association. They also brought state law claims for intentional infliction of emotional distress; for assault and battery as to the three boys and Sandoval; and for false imprisonment as to the three boys, Sandoval, and Kenya.

The district court granted summary judgment in favor of the LVMPD and its officers on all claims, primarily on the

basis of qualified immunity under federal law and discretionary function immunity under Nevada state law.

## ANALYSIS

### FRAMEWORK FOR QUALIFIED IMMUNITY ANALYSIS

Our de novo review of a grant of summary judgment based on qualified immunity involves two distinct steps. Government officials are not entitled to qualified immunity if (1) the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendants'] conduct violated a constitutional right" and (2) the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We may address these two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Whether the defendants violated a constitutional right and whether the right was clearly established at the time of the violation are questions of law. *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003). If "genuine issue[s] of material fact exist[] that prevent[] a determination of qualified immunity at summary judgment, the case must proceed to trial." *Id.* at 1077.

## I.  FOURTH AMENDMENT UNLAWFUL ENTRY CLAIM

We first consider whether Dunn is entitled to qualified immunity on the Sandovals' claim that Dunn's entry into their home constituted an unreasonable search in violation of the Fourth Amendment. Although the pleadings are not a model of clarity, we adopt the district court's view that the

Sandovals pleaded an unlawful entry claim with respect to the home.[4]

## A.  CLEARLY ESTABLISHED RIGHT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches of the home or the curtilage surrounding the home are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). To make a lawful entry into a home in the absence of a warrant, officers must have either probable cause and exigent circumstances or an emergency sufficient to justify the entry. *Struckman*, 603 F.3d at 738; *see also Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam). These exceptions to the warrant requirement are "narrow and their boundaries are rigorously guarded." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (internal quotation marks omitted). The police must "show that a warrant could not have been obtained in time," *Struckman*, 603 F.3d at 738 (internal quotation marks omitted), and must demonstrate "specific and articulable facts to justify the finding" of either exigent circumstance or emergency. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000).

---

[4] The Sandovals' enclosed back yard, which the officers entered just before entering the home, was curtilage subject to Fourth Amendment protection. *United States v. Struckman*, 603 F.3d 731, 738–39 (9th Cir. 2010) (noting that "a small, enclosed yard adjacent to a home in a residential neighborhood" is curtilage). Nevertheless, the claim on appeal is restricted to Dunn's entry into the home, since the Sandovals challenge neither the officers' entry into the curtilage nor Roberts's later entry into the home.

For qualified immunity purposes, in determining whether a constitutional right was clearly established, it is not enough that there is a generally established proposition that excessive use of force is unlawful. *See Saucier*, 533 U.S. at 202. Rather, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation marks omitted). It is, however, "not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005) (alterations in original) (internal quotation marks omitted).

Because it is "clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances" or emergency, the officers are not entitled to qualified immunity unless their entry was justified by one of the two exceptions. *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001); *see also Hopkins*, 573 F.3d at 772. We consider each in turn.

## B. VIOLATION OF CONSTITUTIONAL RIGHT

### 1. Warrantless Entry: Exigency Exception

The exigency exception permits warrantless entry where officers "have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law

enforcement efforts." *Hopkins*, 573 F.3d at 763 (internal quotation marks omitted).

We considered the bounds of the exigency exception in *Struckman*, 603 F.3d at 739–40, 743–44. In that case, we held that officers did not have probable cause for burglary or attempted burglary where "upon arriving at the house, the officers knew only that a neighbor had reported seeing a white male wearing a black jacket throw a red backpack over a fence and climb over the fence into the backyard when the owners were reportedly not home," where there were "no indications that Struckman[, the arrestee, who matched the informant's description,] had entered or attempted to enter the home," and where "there were no signs of forced entry or the presence of any tools consistent with a possible burglary." *Id.* at 740. Nevertheless, the presence of a person matching the caller's description led us to "assume[,] although the assumption [wa]s weak," that the officers had probable cause for the lesser offense of criminal trespass. *Id.* at 743; *see also Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995) (holding that officers did not have probable cause to enter a house on the basis of a neighbor's report of suspicious activity and an open door), *abrogated on other grounds by United States v. Ramirez*, 523 U.S. 65, 69-70 (1998).

Taking the facts in the light most favorable to the Sandovals, we conclude that the officers here did not have probable cause for either burglary or the lesser offense of "prowling." *Saucier*, 533 U.S. at 201. Simply put, this case is not *Struckman.*

When the officers arrived at the house, responding to a "prowler call"[5] and aware of Schouten's tip, they observed signs that Dunn admitted were consistent with either lawful or unlawful activity.[6] In contrast to *Struckman*, 603 F.3d at 740, in which officers encountered a suspect exactly matching the informant's description—white man, black jacket, red backpack—the officers here encountered three boys who did not match the informant's description in race, number, or age. Significantly, one of the two suspects had already fled over the fence, so the scene the officers encountered was a complete mismatch with the description in the tip call. The officers gathered no information to suggest that the boys were on the premises illegally. Indeed, neither the physical signs at the scene nor the boys' behavior—sitting

---

[5] Dunn stated that the officers were responding to a "prowler call," not a "burglary call," and that a prowler call is a misdemeanor call. Roberts, reading the dispatch record, testified that the call was a "403," which is a misdemeanor prowler call, revising his earlier testimony.

Despite later deposition testimony that the call had been upgraded to a possible burglary, the police continued to characterize the incident as a "prowler call" even after it had ended. *See* Statement of Albert Schouten (listing, in section of form completed by police officer, the "specific crime" as "prowler"). The form was completed at 3:15 p.m. on the day of the incident, approximately an hour and twenty minutes after the incident was called in.

[6] Roberts testified that the factors the officers saw upon arrival—an open gate, an open window, an open shed, an open door, an open slider—did not give rise to probable cause to believe that a crime was being committed, and that he "would hope [his colleagues] would have the same opinion as [he did]." *Cf. Burrell v. McIlroy*, 464 F.3d 853, 857 n.2 (9th Cir. 2006) (amended opinion) (noting that "[b]ecause the detectives were working in close concert, a court may consider the collective knowledge of these detectives in considering their beliefs concerning probable cause or reasonable suspicion").

on a bed, watching television, listening to music, and playing video games—was consistent with a burglary in progress. In fact, the officers observed open doors and open windows which they described as consistent with residential use. The officers had no basis, either at the moment they breached the curtilage or at the moment Dunn entered the house, to conclude that the boys had violated any laws.

We note that the Supreme Court's recent qualified immunity cases do not shed light on the circumstances here. For example, in *Stanton v. Sims*, 134 S. Ct. 3 (2013) (per curiam), the Supreme Court addressed the nationwide division "on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect." *Id.* at 5. In this case, unlike in *Stanton*, neither probable cause nor hot pursuit was established.

Likewise, we recognize that "[n]ormally, when officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006). So long as the officers have established probable cause for a burglary, "[i]n such exigent circumstances, the police are entitled to enter immediately, using all appropriate force." *Id.* But here, the officers arrived at the house to investigate a misdemeanor "prowling" call, rather than a felony "burglary" or "attempted burglary" call, and never had probable cause for prowling, let alone for a burglary. This distinction matters, because whereas burglary and attempted burglary are considered to carry an inherent risk of violence, *see, e.g.*, *James v. United States*, 550 U.S. 192, 203–04 (2007), "prowling" is not considered a violent crime, *cf. Medway v. Cate*, 756 F. Supp.

2d 1280, 1297 (S.D. Cal. 2010). The officers were therefore not entitled to enter the house without a warrant under *Frunz*.[7]

In sum, Dunn's warrantless entry into the home was not supported by probable cause, and thus violated the Sandovals' rights. *See, e.g.*, *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam) (noting that "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home"). Because it is "clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances," *Bailey*, 263 F.3d at 1032; *see also Hopkins*, 573 F.3d at 772, the officers are not entitled to qualified immunity unless they can demonstrate that they entered the curtilage or the house pursuant to the remaining emergency aid exception to the warrant requirement.

### 2.   Warrantless Entry: Emergency Aid Exception

The emergency aid exception typically has been understood to permit law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). We assess officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ryburn v. Huff,* 132 S. Ct. 987, 992 (2012) (per curiam) (internal quotation marks omitted).

---

[7] The district court also conflated the standard for warrantless entry in suspected burglary cases, *see Frunz*, 468 F.3d at 1145, with the standard for the reasonable use of force, *Graham*, 490 U.S. at 395–96.

Before *Brigham City*, our caselaw considered officer safety as part of the exigency exception, for which probable cause is a prerequisite. *See, e.g.*, *United States v. Brooks*, 367 F.3d 1128, 1133 n.5, 1135 (9th Cir. 2004). Following *Brigham City*, the cases counsel that officer safety may also fall under the emergency rubric. *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008) (holding that threat to officer safety falls under the emergency exception requirement)*; see also Ryburn*, 132 S. Ct. at 990–91 (holding that a "reasonable police officer could read" *Brigham City* and related decisions "to mean that the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence," and noting that the officers in *Ryburn* "could have come to the conclusion that there was an imminent threat to their safety and the safety of others."). We need not determine whether officer safety should be understood, post-*Brigham City*, as both emergency and exigency, or as falling in only one of the two categories. Either way, there is no objective basis for applying the emergency aid exception to the Sandovals' case.

The officers do not contend that Dunn entered the home to protect anyone within the home, and the record, taken in the light most favorable to the Sandovals, does not support an objective view that Dunn entered the house in service of officer safety. Roberts testified that he saw no weapons in the boys' hands and that he "never perceived a threat from the kids to [his] personal safety." The boys testified that they obeyed the officers' commands at all times. Even crediting Dunn's testimony that he felt that his partner "couldn't control the [boys]" from the window, or that he heard the tone of his partner's voice change, such a "concern," particularly if juxtaposed with Roberts's lack of concern about a threat,

hardly supports a claim that entry was necessary to protect the officers from imminent injury.

Dunn's further testimony did not mention particularized or imminent threats of violence, as the emergency aid exception demands. *See United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (per curiam) (noting that, where officers seek to justify a warrantless entry on the basis of "a risk of danger to the arresting officers or third persons," the "government bears the burden of showing specific and articulable facts to justify" invoking the exception) (internal quotation marks omitted). Dunn's only mention of a threat was in terms so general that they could apply to any interaction involving suspects in a home: Dunn stated "[b]ecause he's inside—the subjects are inside, he [Roberts] is outside. There's multiple rooms that suspects could run to. Possibly ambush us. Kill us. Unknown what weapons there are in the house or what they have hidden inside that residence at the time could possibly hurt us. So we had to control the situation. And he could not control it from outside the residence." Construing such testimony as justifying entry would eviscerate the warrant requirement and support warrantless entry in every home burglary or prowler situation. Simply invoking the unknown in these circumstances is not sufficient. Indeed, Roberts's clear statement about the lack of any perceived threat best sums up the reality of the afternoon. At best, this conflict raises a factual issue that cannot be resolved against the Sandovals at this stage.

As we noted above, once officers have established probable cause for a burglary, the exigent circumstances exception may entitle them to enter a house without a warrant. But a possible burglary confers no automatic entitlement to enter under the emergency exception, nor does

a prowling investigation carry an inherent risk of violence. *Cf. Medway*, 756 F. Supp. 2d at 1297. To the extent that the district court's holding that Dunn had a "reasonable belief that an imminent threat of violence existed" relied on *Frunz*, or on the finding that "[t]here were numerous indications that a burglary may have been in progress," the district court erred.

This record stands in stark contrast to cases in which we have held, under the emergency aid exception, that officers had an "objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm." *Snipe*, 515 F.3d at 952. In *Michigan v. Fisher*, the Supreme Court held that an emergency existed sufficient to justify warrantless entry where officers arrived at a house after a report that "a man was 'going crazy,'" and arrived to find "a household in considerable chaos," including broken house windows, shattered glass on the ground, a smashed truck with blood on the hood, blood on the house door, and a man, visible through a window, "inside the house, screaming and throwing things." 558 U.S. 45, 45–46 (2009) (per curiam). In *Ryburn*, the Court held that officers could invoke the emergency aid exception where, after arriving at the home of a high school student who reportedly threatened to "'shoot up' a school," officers encountered facts, including the suspected presence of weapons in the home and suspicious behavior on the part of the student's mother, that "led them to be concerned for their own safety and for the safety of other persons in the residence." 132 S. Ct. at 988, 990, 992.

By contrast, Dunn and Roberts arrived at a home to find a pattern consistent with either lawful or unlawful activity, but with no evidence of weapons, violence, or threats. The testimony that a reasonable officer would have perceived an

immediate threat to his safety is, at a minimum, contradicted by certain portions of the record. The facts matter, and here, there are triable issues of fact as to whether "violence was imminent," *id.* at 992, and whether Dunn's warrantless entry was justified under the emergency exception. We hold that Dunn is not entitled to qualified immunity because it was clearly established law as of 2009 that the warrantless search of a dwelling must be supported by either the exigency or the emergency aid exception. *Cf. Payton*, 445 U.S. at 586.

## II. FOURTH AMENDMENT EXCESSIVE FORCE CLAIMS

We next consider whether the officers were entitled to qualified immunity on the Sandovals' excessive force claims. The district court dismissed the claims, grounding its decision in the notion that the officers "reasonably believed Henry, Jordhy, and David were burglars."

### A. CLEARLY ESTABLISHED RIGHT

Excessive use of force in effectuating a seizure violates the Fourth Amendment. *Graham*, 490 U.S. at 388. As with the unlawful entry claim, we judge the reasonableness of the use of force from the perspective of a reasonable officer at the scene, rather than in hindsight. *Ryburn*, 132 S. Ct. at 992.

Two distinct instances of the use of force are at issue here. The first question relates to pointing a gun at the head of at least one of the boys. In *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc), we held that police officers had used excessive force when they drew a gun and pointed it at the head of an apparently unarmed misdemeanor subject, a fact pattern similar to that here. The events of this case took place in 2009, seven years after *Robinson*. The

constitutional right was clearly established for qualified immunity purposes. *See also Tekle v. United States*, 511 F.3d 839, 845–47 (9th Cir. 2007) (reviewing cases); *Frunz*, 468 F.3d at 1146 (holding that "[b]ursting through the back door unannounced with guns drawn and handcuffing the occupants—the owner for a full hour—was neither necessary nor reasonable" and that "[n]o reasonable officer familiar with the law of searches and seizures could have thought otherwise").

The second question is whether the officers were on notice that handcuffing, removing from their residence, and detaining compliant persons not suspected of any crime, or alternatively that causing excessive pain while handcuffing or placing someone into a squad car, constituted excessive force. Our cases are instructive on this point. In *Meredith v. Erath*, we held that an agent was not entitled to qualified immunity where he handcuffed a nonviolent resident of a house during an IRS search of the premises, and further that he was not entitled to qualified immunity where there was a genuine issue of fact as to whether he handcuffed the resident in a manner that caused her pain. 342 F.3d 1057, 1061 (9th Cir. 2003); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir. 2013) (noting that detaining a suspected misdemeanant may violate the Fourth Amendment where there is an insufficient basis to conclude that there is a "likelihood for ongoing or repeated danger or escalation," and listing cases) (internal quotation marks omitted); *Tekle*, 511 F.3d at 845–47. *Meredith* reaffirmed that "handcuffing substantially aggravates the intrusiveness of a detention," 342 F.3d at 1062 (internal quotation marks omitted), and that the use of handcuffs must be "justified by the totality of the circumstances," *id.* at 1063 (reviewing cases). After *Franklin v. Foxworth*, a "detention conducted in connection with a

search may be unreasonable if it is unnecessarily painful." 31 F.3d 873, 876 (9th Cir. 1994). Because the events of this case took place years after both *Meredith* and *Franklin*, the right to be free from excessive force under the circumstances relevant here was clearly established for qualified immunity purposes.

## B.  VIOLATION OF CONSTITUTIONAL RIGHT

We analyze claims that an officer used excessive force under an "objective reasonableness" standard, which requires balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 395–96 (internal quotation marks omitted).

The district court found that the boys and Sandoval stated claims for excessive use of force, but that governmental interests in officer safety, investigating a possible crime scene, and controlling an interaction with possible burglars outweighed the intrusions upon the Sandovals' rights.

In reaching this conclusion, the court improperly "weigh[ed] conflicting evidence with respect to . . . disputed material fact[s]." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *see also Saucier*, 533 U.S. at 201. For instance, the court justified the use of force against the boys on the grounds that they were "potentially noncompliant," and against Sandoval and Henry on the grounds that they were "acting irrationally" and "not complying with the officers' commands," and that the police were continuing to investigate a "potential" or "possible crime scene."

Each of these conclusions was based on conflicting testimony, and drew upon the officers' version of events rather than the Sandovals' testimony, as *Saucier* requires. 533 U.S. at 201. Taken in the light most favorable to the Sandovals, the evidence reflects that the boys complied with the officers' commands at all times; that the officers detained Henry despite what they concede was his full compliance outside the house and despite their knowledge that he had committed no crime; and that, by the time Sandoval returned home, the officers knew or had come to assume that Henry lived in the home and that none of the boys had been in the house illegally.[8] The evidence does not justify the district court's conclusion that the officers had a "reasonabl[e] belie[f] that the three young men were committing a burglary"[9] or that the officers were investigating a "potential crime scene" during the contested exercises of force.

To be sure, the reasonableness inquiry in the context of excessive force balances "intrusion[s] on the individual's Fourth Amendment interests" against the government's

---

[8] Roberts stated that he started to realize "maybe these kids aren't burglars" after Henry said "you shot my dog," because "from a commonsense standpoint, why would a burglary suspect have a dog in a residence? . . . So I started to think, maybe these aren't burglary suspects. Maybe they live there and we need to be— . . . we need to slow everything down and calm everything."

Roberts heard Henry outside the residence speaking on the phone to his father and asking him to return home, and learned from this, if not from earlier events, that Henry lived at the house. Roberts further stated that, up to that point, he had "not observe[d] a crime."

[9] As we noted above, *see* text citing note 8, *supra*, and as is critical to a balancing of equities under *Graham*, 490 U.S. at 395–96, the officers never had probable cause for a crime bearing an inherent risk of violence.

interests. *Graham*, 490 U.S. at 396 (internal quotation marks omitted). But in weighing the evidence in favor of the officers, rather than the Sandovals, the district court unfairly tipped the reasonableness inquiry in the officers' favor. We reverse the grant of qualified immunity to the officers on the Sandovals' excessive force claims.

## III.     REMAINING FEDERAL CLAIMS

### A.  FAMILIAL ASSOCIATION CLAIM

The Sandovals claim that the officers deprived them of the right to familial relations when they kept Sandoval and his son Henry separated for forty minutes, when they used excessive force, and when they shot the dog, Hazel. Although parents have a "fundamental liberty interest" in companionship with their children, *Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985), where, as with the Sandovals' case, a separation is brief, or does not "ris[e] to the level of conduct that 'shocks the conscience,'" there is no due process violation, *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (per curiam). Likewise, the shooting of the family dog, albeit sad and unfortunate, does not fall within the ambit of deprivation of a familial relationship.[10]

---

[10] The Sandovals' excessive force claim as to the dog fares no better. The Sandovals failed to plead unlawful seizure of property under the Fourth Amendment, and the Fourth Amendment's protection of "persons" does not extend to dogs. *See San Jose Charter of Hells Angels Motorcycle Club*, 402 F.3d at 975.

### B.  EQUAL PROTECTION

We also affirm the grant of summary judgment to the officers on the family's equal protection claim. The family alleged that its rights were violated when officers, responding to a tip about potential criminal activity by two "white males," pursued Henry and his friends, who were of Hispanic origin and had a dark skin tone. To avoid summary judgment, the family must "produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the] decision . . . was racially motivated." *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (amended opinion) (alteration in original) (internal quotation marks omitted). No evidence supports a finding of discriminatory intent by the officers.

### C.  MUNICIPAL LIABILITY

To impose liability on a local government under § 1983, the Sandovals must prove that an "'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). In the alternative, they must prove that inadequate training or supervision was the moving force behind the deprivation. *City of Canton v. Harris*, 489 U.S. 378, 387–90 (1989). The Sandovals' bare-bones allegations of municipal liability on the grounds that "multiple officers with varying degrees of experience" were involved in the events are insufficient to establish municipal liability.

## IV.    STATE LAW CLAIMS

The district court granted summary judgment to the officers on the Sandovals' state law claims for intentional infliction of emotional distress, assault, battery, and false imprisonment on two grounds: first, that the officers were entitled to discretionary-function immunity under Nevada Revised Statute § 41.032, and second, because there was no genuine issue of material fact as to these claims.[11]

Nevada's discretionary-function immunity statute provides that "no action may be brought" against a public officer "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." Nev. Rev. Stat. § 41.032(2). Under Nevada law, state actors are entitled to discretionary-function immunity if their decision "(1) involve[s] an element of individual judgment or choice and (2) [is] based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 123 Nev. 433, 436–37 (2007).

---

[11] We adopt the district court's view that the Sandovals did not waive this second ground. Moreover, the Sandovals submitted extensive factual material and the district court reviewed the factual record in ruling on the summary judgment motion. The Sandovals filed numerous materials with their opposition to the motion for summary judgment, including depositions from Roberts and Dunn, Officer Kohntopp, Jesus Sandoval, Henry, David, and Jordhy; the LVMPD Incident Recall for the event; and the statement of Albert Schouten, and at least cursorily incorporated these "papers" by reference in their opposition to the motion for summary judgment, though this is not dispositive. The court "kn[ew] of record materials that show grounds for genuine dispute," and as such, the court was permitted "not to consider [a] fact as undisputed." FED. R. CIV. P. 56 (e) advisory committee's note, 2010.

Police officers "exercise[] discretion and [are] thus generally immune from suit where the act at issue required 'personal deliberation, decision, and judgment,' rather than 'obedience to orders, or the performance of a duty in which the officer is left no choice of his own.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) (quoting *Maturi v. Las Vegas Metro. Police Dep't.*, 110 Nev. 307, 309 (1994)). Officers' decisions "as to how to accomplish a particular seizure or search [are] generally considered . . . discretionary determination[s] under Nevada law, and officers are therefore immune from suit as to state law claims arising therefrom in most cases." *Id.* But "where an officer's actions are 'attributable to bad faith, immunity does not apply whether an act is discretionary or not.'" *Id.* (quoting *Falline v. GNLV Corp.*, 107 Nev. 1004, 1009 n.3 (1991)). As we held in *Davis*, "where an officer arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest, but instead . . . because of a willful or deliberate disregard for the rights of a particular citizen or citizens, the officer's actions are the result of bad faith and he is not immune from suit." *Id.* at 1060 (citing *Falline*, 107 Nev. at 1009 (noting that an officer acts in bad faith where his acts bear "no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority")); *see also id.* (noting that "[n]o officer has the 'rightful prerogative' to engage in a malicious battery of a handcuffed citizen who is neither actively resisting arrest nor seeking to flee," and holding that Nevada's discretionary immunity statute did not apply to arrestee's claim of battery where officer slammed handcuffed arrestee into wall multiple times and punched him in the face).

Taking the facts in the light most favorable to the Sandovals, none of their claims survive, including Kenya's, except as to Jesus Sandoval's claims and the boys' claims related to their handcuffing and detention once the officers knew no crime had been committed. A reasonable juror could find that the officers' decisions to, among others, handcuff and force the ailing Jesus Sandoval into a cruiser and ignore his requests for medication, as well as to continue to detain and handcuff the boys after it was clear no detention was justified, "w[ere] not merely an exercise or abuse of discretion but instead constituted a deliberate and willful disregard for the law . . . ." *Id.*; *cf. Pike v. Hester*, No. 3:12-cv-00283, 2013 WL 3491222, at *5 (D. Nev. July 9, 2013) (denying summary judgment on Nevada immunity grounds because the plaintiff had attested to his belief that an officer's personal animus towards him was the cause of the illegal search of his office). The district court erred in granting summary judgment to the officers on the grounds of statutory immunity.

The district court also erred in finding that the Sandovals failed to establish any genuine issues of material fact as to these claims. Viewing the state law claims through the lens presented by the Sandovals, as *Saucier* requires, material issues of fact exist for each of the state law claims not precluded by discretionary-function immunity. 533 U.S. at 201. We accordingly reverse the district court's grant of summary judgment to the officers on the state law intentional infliction of emotional distress, assault and battery, and false imprisonment claims as they relate to (1) Jesus Sandoval and (2) the handcuffing and detention of the boys once the officers knew no crime had been committed. We affirm the dismissal of the remaining state law claims.

We therefore **REVERSE** the district court on the Fourth Amendment claims for excessive force and unlawful entry, and on the state law claims detailed immediately above, **AFFIRM** the judgment on the remaining claims, **and REMAND** for proceedings consistent with this opinion. Each party shall pay its own costs on appeal.

**REVERSED IN PART; AFFIRMED IN PART AND REMANDED.**