THOMAS, Chief Judge,
dissenting:
Sara Lowry was sleeping in the privacy of her office, when she was attacked and injured by a police dog trained to inflict harm on the first person it encounters. Because a reasonable jury could find that the City of San Diego’s use of a police dog was unreasonable under the circumstances presented here, I must respectfully dissent.
I
In my view, the district court erred in concluding that no reasonable jury could find that an excessive force constitutional violation had occurred. Under the Graham v. Connor framework, “[d]etermining whether the force used to effect a particular seizure is ‘reasonable’ under the Fourth Amendment requires a careful balancing of ‘the nature and quality of the intrusion on the individual’s Fourth Amendment interests’ against the countervailing governmental interests at stake.” 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). As the majority notes, *1261 the analysis of the government’s interest in the use of force “requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he [or she] is actively resisting arrest or attempting to evade arrest by flight.” Id. (citing Garner, 471 U.S. at 8-9, 105 S.Ct. 1694); Majority Op. 1256, 1257.
While recognizing that “[t]he ‘reasonableness’ of a particular use of force must be judged from the perspective of a reasonable officer on the scene,” id. (citing Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), on summary judgment a court must construe any disputed facts and draw all reasonable inferences in favor of the non-moving party, Oswalt v. Resolute Indus., Inc., 642 F.3d 856, 859 (9th Cir. 2011). Here, construing the facts and drawing reasonable inferences in Lowry’s favor, a jury could find that the force used was severe, that the government’s interest in the use of that force was not especially strong, and, therefore, that the use of a police dog was unreasonable.[1]
A
At the first step of the Graham inquiry, a reasonable jury could find that the intrusion on Lowry’s Fourth Amendment interests was moderate or even severe because of the dog bite Lowry suffered, coupled with the risk of greater harm she faced from an off-leash police dog trained to bite and hold the first person it found.
Both Supreme Court precedent and our case law require consideration of the risk of harm that may be inflicted by a particular use of force. Graham itself requires analyzing both the “nature and quality of the intrusion,” 490 U.S. at 396, 109 S.Ct. 1865 (quoting Garner, 471 U.S. at 8, 105 S.Ct. 1694), and the Supreme Court has more recently explained that this prong of the analysis requires a court to “consider the risk of bodily harm that [the officer]’s actions posed to [the plaintiff],” Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Similarly, we have held that this inquiry'requires “evaluating the type and amount of force inflicted.” Miller v. Clark Cty., 340 F.3d 959, 964 (9th Cir. 2003) (emphasis added) (citing Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994)). Thus, the risk of harm posed by a particular use of force—not just the amount of harm actually caused in hindsight—is properly considered as part of the first Graham step.
In the current case, Lowry testified that Sergeant Nulton remarked that the dog could have “ripped [Lowry’s] face off’ and that she was “very lucky” to have gotten only a relatively small bite. In short, there is no dispute that Lowry faced a significant risk of harm when the dog was released into the suite where she was sleeping. Our prior decisions have similarly recognized that “police dogs can—and often do—cause serious harm.” Vera Cruz v. City of Escondido, 139 F.3d *1262 659, 661 (9th Cir. 1997), overruled on other grounds by Smith v. City of Hemet, 394 F.3d 689 (9th Cir. 2005).
In other cases where we have addressed the use of bite-and-hold police dogs, as the majority explains, one plaintiff had suffered a dog bite that “went as deep as the bone” and “shredded” the muscles in his arm, Miller v. Clark Cty., 340 F.3d 959, 961, 964 (9th Cir. 2003), while another sustained multiple bites that “nearly severed” his arm, Chew, 27 F.3d at 1441; Majority Op. 1256-57. Though the officers in the present case took steps to reduce the risk of harm by following the dog closely and calling him off quickly, these other cases nonetheless illustrate the risk of severe harm that a bite-and-hold police dog may inflict when deployed off-leash as occurred here. Therefore, in assessing the reasonableness of the force at the moment when the officers made the decision to use an off-leash police dog—rather than in hindsight, based on Lowry’s actual injuriesa reasonable jury could find that the use of force was moderate or severe.
B
On the other side of the Graham scale, a reasonable jury could find that the government did not have a strong interest in using an off-leash bite-and-hold police dog under these circumstances.
1
To evaluate the totality of the circumstances as they relate to this step of the Graham analysis, we must assess the fact disputes raised by Lowry, particularly the dispute as to whether the door to Lowry’s office suite was open (as the officers contend) or closed (as Lowry contends).[2] Low-ry presented admissible evidence that raised a genuine dispute of material fact as to whether the door was open; this fact must therefore be construed in her favor at the summary judgment stage.
In reviewing a district court’s evidentiary ruling at the summary judgment stage, as the majority notes, we will reverse a ruling that is “manifestly erroneous and prejudicial.” Bias v. Moynihan, 508 F.3d 1212, 1224 (9th Cir. 2007) (quoting Bailen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006)); Majority Op. 1255. The district court’s exclusion of Lowry’s testimony about the door was both. Although we generally “refuse[] to find a ‘genuine issue’ where the only evidence presented is ‘uncorroborated and self-serving’ testimony,” Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)), we have also “acknowledged that declarations are often self-serving,” Nigro v. Sears, Roebuck & Co., 784 F.3d 495, 497 (9th Cir. 2015) (citing S.E.C. v. Phan, 500 F.3d 895, 909 (9th Cir. 2007)). We have therefore cautioned that “the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature.” Id. (citing Phan, 500 F.3d at 909). Thus, even “uncorroborated and self-serving” testimony may be sufficient to establish a genuine dispute of fact where it is “based on personal knowledge, legally relevant, and internally consistent.” Id. at 498.
Here, Lowry testified that the door to Suite 201 was shut when the officers arrived because it had automatically closed *1263 behind her after she came back in from the bathroom. At her deposition, Lowry gave the following testimony:
Q. Do you know if the door closed all the way or was it propped open?
A. No. It was not propped. It was closed all the way behind me.
Q. Okay. And how do you know that?
A. Because it closes automatically. I would have had to prop it open myself.
Q. And do you recall doing that?
A. No.
The district court considered this testimony to be speculation rather than firsthand testimony and determined that the testimony was insufficient to create a dispute of fact. But Lowry’s testimony is based on her first-hand knowledge of the door in question and her personal recollection that she did not prop it open on the night in question. Her testimony is also specific, “legally relevant, and internally consistent.” Id. at 498. “[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented.” Schlup v. Delo, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978)). As the Supreme Court has further observed, “[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.” Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, it was error for the district court to assess Lowry’s credibility and to exclude her testimony.
The exclusion of this testimony, in turn, prejudiced Lowry by denying her an opportunity to show a dispute of fact as to whether the door to the suite was open. Although Lowry’s testimony conflicts with the officers’ testimony that the door was open when they arrived, at the summary judgment stage the court may not weigh the moving party’s evidence against the nonmoving party’s evidence. Rather, “the judge must assume the truth of the evidence set forth by the nonmoving party.” Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999) (quoting T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass’n, 809 F.2d 626 (9th Cir. 1987)). Under this standard, Lowry’s testimony raised a genuine dispute of fact as to whether the door was open, and the district court erred in concluding otherwise.
2
Construing this fact and the other circumstances surrounding the incident in the light most favorable to Lowry, and drawing all reasonable inferences in her favor, a reasonable jury could conclude that the government did not have a strong interest in using an off-leash, bite-and-hold-trained police dog here.
First, under “the most important single element” of Graham’s government-interest analysis, a reasonable jury could find that the officers on the scene had little reason to believe Lowry “pose[d] an immediate threat to the safety of the officers or others.” Chew, 27 F.3d at 1441 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865). Assuming that the door to Lowry’s office suite was closed, as we must at this stage, the officers arriving on the scene saw that the only way to arrive at the second-floor suites was via a locked gate or by scaling a tall wall, and they saw no open doors nor any signs of forced entry.[3] A jury could *1264 find that, from the officers’ perspective, these circumstances increased the likelihood that the burglar alarm was a false alarm and “materially diminished the risk of violent confrontation.” See Frunz v. City of Tacoma, 468 F.3d 1141, 1145 (9th Cir. 2006),
Despite the majority’s assertion that officers are entitled to presume a burglary suspect poses an immediate threat, Majority Op. 1257-58, our caselaw does not compel that conclusion. Rather, in Miller v. Clark County, 340 F.3d 959 (9th Cir. 2003), the officers “knew that Miller had possessed a large knife moments earlier, a fact that suggested] Miller had a propensity to carry a weapon.” Id. at 965. Here, by contrast, the officers had no specific reason to believe that any person assumed to be inside the office suite was armed.
The City’s reliance on Frunz to argue that burglars may be presumed armed is similarly misplaced. Frunz merely stated in dicta that burglars can sometimes be presumed dangerous, to highlight the contrast with the situation in that case, where the officers knew of certain facts that “made it far less likely that what was going on was a burglary and materially diminished the risk of violent confrontation.” 468 F.3d at 1145. Ultimately, therefore, Frunz stands only for the proposition that officers must consider all known facts in determining whether a burglary suspect is likely to offer armed resistance.[4] Id.
Applying Frunz’s admonition to the current case, the circumstances known to the officers gave little' indication that there was an armed suspect inside Suite 201. At the summary judgment stage, critically, the relevant question is not whether the officers could possibly have believed a burglary was occurring but, rather, whether a jury could potentially find that the officers’ beliefs were unreasonable under the circumstances. Construing the facts in Low-ry’s favor, a reasonable jury could find that the officers had little reason to believe that any suspect inside the building “pose[d] an immediate threat to the safety of the officers or others.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. Thus, on summary judgment, this factor weighs in favor of Lowry.
The next Graham factor asks us to consider “the severity of the crime at issue.” 490 U.S. at 396,109 S.Ct. 1865. The parties dispute whether burglary is considered a serious crime, but the answer to that question does not end the inquiry. Even if the officers were entitled to presume that burglary is a serious crime,[5] the real dispute *1265 centers on whether a reasonable officer on the scene would have concluded that a burglary was in fact taking place, or would have considered the possibility that the burglar alarm was a false alarm, and then acted accordingly.
The fact dispute as to whether the door was open is significant again here: with the door of an office suite ajar at night, the scene looks more like an active burglary; with a closed door and no signs of forced entry, it becomes more likely that the alarm was a false alarm. Construing this fact and drawing all reasonable inferences in Lowry’s favor, a jury could find that the officers had reason to doubt an actual burglary was taking place. Because a reasonable officer might not believe a severe crime was taking place, this factor weighs in favor of Lowry at the summary judgment stage.
The final Graham factor asks whether the officers reasonably believed that the suspect was “actively resisting arrest or attempting to evade arrest by flight.” 490 U.S. at 396, 109 S.Ct. 1865. The City contends that Lowry’s failure to heed Sergeant Nulton’s warnings led the officers to believe that the suspect inside the suite was resisting arrest. Yet even if Lowry failed to raise a genuine dispute as to whether the warnings were given, and even if a reasonable officer at the scene would have believed that a person inside the suite heard them, Lowry’s simple failure to respond to the warnings does not constitute actively resisting arrest. She was not moving at all.
“Following the Supreme Court’s instruction in Graham, we have drawn a distinction between passive and active resistance,” as the majority acknowledges. Bryan v. MacPherson, 630 F.3d 805, 830 (9th Cir. 2010) (citing Forrester v. City of San Diego, 25 F.3d 804, 805 (9th Cir. 1994)); Majority Op. 1258. When a suspect’s only resistance is failure to comply with a police order, and when that resistance is “not particularly bellicose,” it is considered passive and does not weigh heavily in the government’s favor. Id.) see also City of Hemet, 394 F.3d at 703. Under this precedent, a reasonable jury could find that Lowry’s mere failure to respond to the warnings did not constitute active resistance. Thus, on summary judgment, this factor weighs in favor of Lowry.
To the extent that “the giving of a warning or the failure to do so” is sometimes also considered as an independent factor in the Graham balancing test, Nelson v. City of Davis, 685 F.3d 867, 882 (9th Cir. 2012) (quoting Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir. 2001)), I do not disagree with the majority’s conclusion that this factor weighs in favor of the City because the officers had no reason to know that the person inside the building was sleeping and did not hear their warnings. Cf. Blanford v. Sacramento County, 406 F.3d 1110, 1116 (9th Cir. 2005) (holding that the presence of warnings weighed in favor of the officers where they had no reason to know the suspect was wearing headphones and did not hear the warnings); see Majority Op. 1258-59.
Finally, our precedent also allows a court to consider whether less intrusive tactics were available to the officers effecting a seizure. See Bryan, 630 F.3d at 831; City of Hemet, 394 F.3d at 703. Here, Lowry argues that instead of using off-leash dogs trained to bite and hold the first person they come across, the City could and should train its dogs to “find and *1266 bark,” an alternative approach in which the dog is trained to bark upon locating a suspect and only bite if the suspect tries to flee. Lowry also suggests that the dog should have been kept on-leash to minimize the risk of harm to any bystanders. The parties dispute the benefits of the “find and bark” method as well as the relative risks and benefits of keeping dogs on-leash during searches like the one in this ease. The record is not well developed on this issue; thus the existence of these alternative methods does not weigh heavily in the excessive force analysis here. However, Lowry has sufficiently raised the issue such that this theory would remain available if we were to remand for further proceedings.
C
Balancing the severity of the intrusion against the government’s interest, at the third step of the Graham analysis, a reasonable jury could conclude that the City’s interest in the use of force did not justify the level of force used here. Construing the facts in the light most favorable to Lowry, a jury could find that the intrusion on Lowry’s Fourth Amendment interests was moderate or severe. On the other side of the scale, the Graham government-interest factors—whether Lowry posed a threat, the severity of the crime, and whether Lowry was resisting arrest—all weigh in favor of Lowry if the facts are construed in her favor, as they must be at this stage. The only factor weighing in favor of the City is the presence of verbal warnings before the dog was released into Lowry’s suite.
Thus, balancing the intrusion caused by an off-leash, bite-and-hold-trained police dog against the government’s interest in the use of canine force under these circumstances, a reasonable jury could find that “a strong government interest” did not “compel[ ] the employment of such force.” Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1057 (9th Cir. 2003) (quoting Deorle, 272 F.3d at 1280 (emphasis in original)). I would therefore hold that the district court erred in concluding, as a matter of law, that the use of a police dog did not constitute excessive force.
II
I respectfully suggest that the district court also erred in concluding that the City could not be liable even if excessive force had been established. A municipality may be liable under 42 U.S.C. § 1983 for constitutional violations inflicted by its employees “when the execution of the government’s policy or custom ... inflicts the injury.” City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (alteration in original) (quoting Springfield v. Kibbe, 480 U.S. 257, 267, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O’Connor, J., dissenting)); see also Monell v. Dep’t of Soc. Servs. of City of N.Y., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). “[I]n this circuit a policy itself need only cause a constitutional violation; it need not be unconstitutional per se.” Jackson v. Gates, 975 F.2d 648, 654 (9th Cir. 1992) (emphasis added) (citing McKinley v. City of Eloy, 705 F.2d 1110, 1117 (9th Cir. 1983)). We have explained that “[c]ity policy ‘causes’ an injury where it is ‘the moving force’ behind the constitutional violation.” Chew, 27 F.3d at 1444 (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018).
In this case, Lowry alleged in her complaint that the City had an official policy that caused her constitutional violation. Before the district court and on appeal, Lowry has specifically argued that the City’s policy of training its dogs to bite and hold a suspect was the direct cause of her injury. The bite-and-hold policy is properly *1267 considered the “moving force” behind Lowry’s injury because the dog lunged at her and immediately bit her, according to his bite-and-hold training. See Chew, 27 F.3d at 1444. Moreover, the City admitted in its answer that “Sergeant Nulton deployed a police services dog in conformity with the official policies and procedures adopted by the San Diego Police Department.” Accordingly, “[t]here is little doubt that a trier of fact could find that [Lowry]’s injury was caused by city policy.” See Chew, 27 F.3d at 1444.
The district court erroneously relied on precedent from the qualified immunity context to conclude that the City’s bite- and-hold policy was constitutional as a matter of law, and thus that the City could not be liable even if Lowry’s constitutional rights had been violated in this particular instance. But our cases analyzing whether the constitutionality of a bite-and-hold policy was clearly established for purposes of qualified immunity did not hold that all applications of a bite-and-hold policy are constitutional. Indeed, we have recognized that the manner in which bite-and-hold force is employed could be unconstitutional in a particular case. Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998) (citing Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994)). In such a case, a municipality could be liable if its bite- and-hold policy is the “moving force” behind an officer’s unconstitutional action, even if the policy is not facially unconstitutional. Here, given the City’s concession that Sergeant Nulton acted pursuant to its official policy, a jury could find that the policy caused Lowry’s constitutional injury and thus that the City is subject to Monell liability.
Finally, contrary to the majority’s suggestion, a Monell plaintiff need not show that the government acted with deliberate indifference to her constitutional rights if she can show that the government’s officers acted affirmatively, pursuant to an official policy. Our cases requiring a showing of deliberate indifference have dealt with a government’s failure to take action or failure to properly train its employees. See Oviatt By & Through Waugh v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992) (describing the requirements necessary for “imposfing] liability on a local governmental entity for failing to act to preserve constitutional rights” (emphasis added) (quoting City of Canton, 489 U.S. at 389, 109 S.Ct. 1197)); see also Gant v. Cty. of L.A., 772 F.3d 608, 618 (9th Cir. 2014) (requiring a plaintiff to show that the government’s “omission amounts to deliberate indifference”); Mortimer v. Baca, 594 F.3d 714, 716 (9th Cir. 2010) (imposing liability when a local government “has a policy of inaction and such inaction amounts to a failure to protect constitutional rights” (quoting Oviatt, 954 F.2d at 1474)); Chew, 27 F.3d at 1445 (distinguishing between the different theories of Monell liability for officially sanctioned affirmative acts and for failure to train).
Because she did not allege a failure to act and instead alleged that the City’s affirmative bite-and-hold policy was the cause of her constitutional injury, Lowry need not demonstrate deliberate indifference. Instead, the City’s admission that Sergeant Nulton acted pursuant to official policy adequately demonstrates that the City’s policy was the “moving force” behind Lowry’s constitutional violation, thereby satisfying this step of the Monell analysis on summary judgment. Accordingly, I would hold that the district court erred in granting summary judgment on this alternate ground.
Ill
By allowing government entities to be held liable when they violate citizens’ con *1268 stitutional rights, § 1983 helps effect the guarantees of the Fourth Amendment. When, as here, a citizen has succeeded in raising disputes of fact as to whether her Fourth Amendment rights were violated, it is for a jury to decide whether a violation occurred and whether the government is liable for that violation.
For these reasons, I respectfully dissent.

. The majority emphasizes that the reasonableness of a particular use of force is a "pure question of law” once the facts are established. See Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Majority Op. 1256 & n.5. However, "[w]here the objective reasonableness of an officer’s conduct turns on disputed issues of material fact, it is ‘a question of fact best resolved by a jury.’ ” Torres v. City of Madera, 648 F.3d 1119, 1123 (9th Cir. 2011) (quoting Wilkins v. City of Oakland, 350 F.3d 949, 955 (9th Cir. 2003)). Because Lowry has succeeded in raising material disputes of fact, as detailed below, it is the task of the jury to resolve those fact disputes and draw any relevant inferences from them.

. As discussed further below, a jury could find that an open door would have given the officers reason to believe a suspect was still in the building, while arriving at a building with no open doors and no signs of forced entry might give the officers less reason to believe that a burglary was actively occurring.

. While the majority suggests that the door was unlocked even if it was not open, Majority Op. 1257 n.6, an unlocked door of the suite next to the one where the alarm was triggered *1264 does not lead to the inevitable conclusion that a burglary is likely occurring.

. Similarly, Sandoval v. Las Vegas Metropolitan Police Department, 756 F.3d 1154 (9th Cir. 2014), on which the majority relies, merely repeated Frunz s statement that officers may enter using "all appropriate force" if the totality of the circumstances leads them to believe that an active burglary is occurring. Id. at 1163 (citing Frunz, 468 F.3d at 1145); Majority Op. 1258.

. The majority relies on Sykes v. United States, 564 U.S. 1, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011), overruled on other grounds by Johnson v. United States,-U.S.-, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), and Sandoval, 756 F.3d 1154, to support its contention that officers are entitled to presume that burglary is both serious and dangerous. Majority Op. 1257-58. In addition to the fact that this approach conflates the first and second Graham factors, neither of these cases involved a Graham analysis.
In Sykes, where the issue presented was an enhanced sentence under the Armed Career Criminal Act, the Court merely noted in passing that burglary "can end in confrontation,” by way of comparison to other possibly violent crimes. Sykes, 564 U.S. at 9, 131 S.Ct. 2267. Sandoval concerned the propriety of a warrantless entry, not the reasonableness of a particular use of force. See 756 F.3d at 1163. Moreover, as explained above, Sandoval *1265 merely condoned the use of appropriate force after the officers have established exigent circumstances based on the totality of the information available to them. Id. at 1163 (citing Frunz, 468 F.3d at 1145).