**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| LAWRENCE L. THOMPSON, *Plaintiff-Appellant*, | No. 16-35301 |
| v. | D.C. No. 2:14-cv-01769-MJP |
| SUE RAHR, Head Sheriff's Officers/and Department, *Defendant*, | OPINION |
| and | |
| PETE COPELAND, Deputy Sheriff Officer; KING COUNTY SHERIFF'S DEPARTMENT, in all, *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted December 7, 2017
Seattle, Washington

Filed March 13, 2018

Before:  Michael Daly Hawkins, M. Margaret McKeown,
and Morgan Christen, Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge Christen

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's summary judgment, on qualified immunity grounds, in a 42 U.S.C. § 1983 action alleging that a police officer used excessive force when he pointed a gun at plaintiff's head in the context of a felony arrest after plaintiff had already been searched, was calm and compliant, and was being watched over by a second armed deputy.

Examining the facts in the light most favorable to plaintiff, the non-moving party on summary judgment, the panel assumed that the police officer did indeed point his gun at plaintiff's head and threatened to kill him. The panel held that under the circumstances, defendant's use of force in arresting plaintiff was not objectively reasonable. The panel held that where, as in this case, officers have an unarmed felony suspect under control, where they easily could have handcuffed the suspect while he was sitting on the squad car, and where the suspect is not in close proximity to an accessible weapon, a gun to the head constitutes excessive force under the Fourth Amendment.

The panel nevertheless held that although the use of excessive force violated plaintiff's constitutional rights, defendant was entitled to qualified immunity because plaintiff's right not to have a gun pointed at him under the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

circumstances was not clearly established at the time the events took place.

The panel addressed plaintiff's other claims for unreasonable search and failure to supervise in a concurrently-filed memorandum disposition.

Dissenting, Judge Christen would hold that the police officer was not entitled to qualified immunity on plaintiff's excessive force claim because plaintiff's right not to have a gun pointed at his head was clearly established in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc), which was decided long before plaintiff's arrest in 2011.

---

## COUNSEL

Benjamin Michael Flowers (argued), Jones Day, Columbus, Ohio, for Plaintiff-Appellant.

Endel R. Kolde (argued), Senior Deputy Prosecuting Attorney, King County Prosecuting Attorney's Office, Seattle, Washington, for Defendants-Appellees.

---

## OPINION

McKEOWN, Circuit Judge:

In recent years, the use of force by police officers making traffic stops has flared into a national debate of renewed importance. At the same time, the doctrine of qualified immunity in the excessive force context has continued to evolve. This appeal presents a question at the intersection of the Fourth Amendment and qualified immunity law. In the

course of a felony arrest, may a police officer point a loaded gun at an unarmed suspect's head, where that suspect had already been searched, was calm and compliant, was watched over by a second armed deputy, and was seated on the bumper of a police cruiser 10–15 feet away from a gun found in the suspect's car?  Because the facts are at this stage disputed, we take the facts in the light most favorable to the suspect.  We hold that pointing a loaded gun at the suspect's head in these circumstances constitutes excessive force under the Fourth Amendment, but that the officers here are entitled to qualified immunity because the law was not clearly established at the time of the traffic stop.

## Background

In December, 2011, Pete Copeland, a deputy in the King County Sheriff's Office ("KCSO"), was on patrol in the City of Burien, Washington.  After watching Lawrence Thompson commit "multiple traffic violations," Copeland pulled him over.  Thompson apologized to Copeland but failed to provide a driver's license, although he did offer up some mail addressed in his name.

When Copeland ran Thompson's identifying information, he discovered that Thompson had a suspended license for an unpaid ticket, that Thompson was a convicted felon, and that his most recent felony conviction was for possessing a firearm.  Copeland decided to arrest Thompson for driving with a suspended license, and to impound Thompson's car, as required by a City of Burien ordinance.[1]

---

[1] Thompson's car was later impounded, after the events described here, and a warrant was issued to search the car.

Copeland had Thompson exit the vehicle and patted him down for weapons. Finding none, Copeland radioed for backup, and had Thompson sit on the bumper of Copeland's patrol car. Copeland then conducted an inventory search of Thompson's vehicle. During his search, Copeland saw a loaded revolver sitting in an open garbage bag on the rear passenger-side floorboard. After seeing the gun, Copeland decided to arrest Thompson for violating the Uniform Firearms Act, a felony. *See* Wash. Rev. Code § 9.41.040.

Thompson continued to sit on the bumper of Copeland's police cruiser, watched over by another deputy who had arrived for backup on the scene. Thompson was about 10–15 feet from the gun in the backseat of his car, and was not handcuffed. Copeland signaled to the deputy watching over Thompson, then drew his gun.

What happened next is disputed by the parties. Copeland claims he unholstered his firearm and assumed a low-ready position, with his gun clearly displayed but not pointed directly at Thompson. By contrast, Thompson claims that Copeland pointed his gun at Thompson's head, demanded Thompson surrender, and threatened to kill him if he did not.

Copeland directed Thompson to get on the ground, face-down, so that he could be handcuffed. Thompson complied and was cuffed without incident. Copeland arrested Thompson for being a felon in possession of a firearm.

The State of Washington charged Thompson with "unlawful possession of a firearm." A Washington state court dismissed the charges after determining that the

evidence against Thompson had been gathered in violation of the Washington State Constitution.**[2]**

Thompson sued Copeland and King County under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights. Specifically, Thompson alleged that Copeland used excessive force in pointing his gun at Thompson and threatening to kill him.**[3]**

In recommending dismissal of this claim, the Magistrate Judge noted that the question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." The Magistrate Judge found that the degree of force used on Thompson was reasonable given that Copeland was conducting a "felony arrest of a suspect who was not secured, who was in relatively close proximity to a weapon, who was taller and heavier than him, and who had a prior felony conviction for unlawfully possessing a firearm." The Magistrate Judge concluded that "Copeland's minimal use-of-force in effectuating [Thompson's] arrest was objectively

---

**[2]** The Washington Supreme Court has interpreted Article I, § 7 of the Washington State Constitution to prohibit traffic stops "which cannot be constitutionally justified for [their] true reason (i.e. speculative criminal investigation), but only for some other reason (i.e., to enforce traffic code) which is at once lawfully sufficient but not the real reason." *State v. Ladson*, 979 P.2d 833, 838 (Wash. 1999); *contra Whren v. United States*, 517 U.S. 806, 813 (1996). Applying this standard, the Washington court found that Copeland's traffic stop was conducted for pretextual reasons, that Copeland's search was illegal under state law, and that therefore the evidence Copeland found must be suppressed.

**[3]** Thompson's other claims for unreasonable search and failure to supervise are addressed in the concurrently-filed memorandum disposition.

reasonable" and did not violate Thompson's Fourth Amendment rights. The Magistrate Judge also recommended granting Copeland's motion for summary judgment on the basis of qualified immunity. The district court adopted the Magistrate Judge's Report and Recommendation, and dismissed Thompson's claims with prejudice, a decision we review de novo. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014).

## Analysis

Our analysis involves two distinct steps. *Id.* Police officers are not entitled to qualified immunity if (1) the facts "[t]aken in the light most favorable to the party asserting the injury" show that "the [officers'] conduct violated a constitutional right" and (2) "the right was clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We may address these two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). These inquiries are questions of law. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017); *Serrano v. Francis*, 345 F.3d 1071, 1080 (9th Cir. 2003).

Because this case was decided on summary judgment, we examine the facts in the light most favorable to the non-moving party and hence assume that Copeland did indeed point his gun at Thompson's head and threaten to kill him—rather than hold it in the alternative low-ready position as Copeland claims. *See Sandoval*, 756 F.3d at 1160. If genuine issues of material fact prevent a determination of qualified immunity, the case must proceed to trial. *Id.*

## I.   Violation of Constitutional Right

Where, as here, Thompson "alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014) (per curiam); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

We approach an excessive force claim in three stages. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). First, we "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (citation and internal quotation marks omitted). Then, we evaluate the government's interests by assessing the severity of the crime; whether the suspect posed an immediate threat to the officers' or public's safety; and whether the suspect was resisting arrest or attempting to escape. *Id.* Finally, we "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.*; *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Applying these standards here, we conclude that Copeland's use of force in arresting Thompson was not objectively reasonable. Accepting Thompson at his word, as we are required to do at the summary judgment stage, Copeland pointed the gun at Thompson's head and threatened to kill him if he did not surrender. This type and amount of force can hardly be characterized as "minor," as the government contends. We have previously held, in the context of a residential confrontation, that "pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force." *Espinosa*, 598 F.3d at 537. With respect to the government's interests, Thompson was suspected of driving with a suspended license and violating the Uniform Firearms Act—potential crimes of low and

moderate severity, respectively. The safety threat either to the officers or the public was relatively low. The government's claim that Thompson "could have charged past Deputy Copeland and grabbed the revolver [in the back of the car] in a matter of seconds" is weak. Thompson would have had to travel 10–15 feet to his car to grab the gun or make any use of it. Thompson had no weapon and had already been searched. He was sitting on the bumper of a squad car, watched over by an armed deputy. He was not "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. He was "compliant with the directions of law enforcement at all times." *See Green v. City & Cty. of S.F.*, 751 F.3d 1039, 1048, 1050 (9th Cir. 2014). Nor did the officers have "reason to believe that he would resist or flee." *See Baldwin v. Placer Cty.*, 418 F.3d 966, 970 (9th Cir. 2005). Reviewing the totality of the circumstances, the force used against Thompson was excessive when balanced against the government's need for such force.

In the end, "pointing guns at persons who are compliant and present no danger is a constitutional violation." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (citing *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (en banc)). A jury could find that "brandishing a cocked gun in front of [Thompson's] face" and threatening to kill him was unreasonable under these particular circumstances. *Robinson v. Solano Cty.*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc) (citation omitted). We do not discount the concern for officer safety when facing a potentially volatile situation. But where the officers have an unarmed felony suspect under control, where they easily could have handcuffed the suspect while he was sitting on the squad car, and where the suspect is not in close proximity to an

accessible weapon, a gun to the head constitutes excessive force.

## II.  No Clearly Established Right

Although the use of excessive force violated Thompson's constitutional rights, Copeland is entitled to qualified immunity because Thompson's right not to have a gun pointed at him under the circumstances here was not clearly established at the time the events took place.  In arriving at this conclusion, we take careful note of recent Supreme Court precedent illuminating the reach and parameters of qualified immunity in the excessive force context.

The Supreme Court long ago laid down the principle that qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For a right to be "clearly established," existing "precedent must have placed the statutory or constitutional question *beyond debate*," such that "every" reasonable official, not just "a" reasonable official, would have understood that he was violating a clearly established right.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added).  Thus, the "dispositive question" is "whether the violative nature of *particular* conduct is clearly established."  *See, e.g.*, *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742).

Just last year, in a case addressing excessive force, the Supreme Court underscored that qualified immunity, when properly applied, protects "all but the plainly incompetent or those who knowingly violate the law."  *White v. Pauly*,

137 S. Ct. 548, 551 (2017) (citation and internal quotation marks omitted). The Court "reiterate[d] the longstanding principle that 'clearly established law' should not be defined at a high level of generality." *Id.* at 552 (citation omitted). And the Court cautioned that, as an "an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 551 (citation and internal quotation marks omitted).

Looking to the particular setup here, we cannot say that every reasonable officer in Copeland's position would have known that he was violating the constitution by pointing a gun at Thompson. Thompson's nighttime, felony arrest arising from an automobile stop, in which a gun was found, coupled with a fluid, dangerous situation, distinguishes this case from our earlier precedent. More specifically, Copeland was conducting a felony arrest at night of a suspect who was not handcuffed, stood six feet tall and weighed two hundred and sixty-five pounds, was taller and heavier than Copeland, and had a prior felony conviction for unlawfully possessing a firearm. Although Thompson was cooperative, the situation was still critical in terms of potential danger to the officers, especially given that a loaded gun was only 10–15 feet away. Copeland did not violate a "clearly established" right as that concept has been elucidated by the Supreme Court in the excessive force context. *See Pauly*, 137 S. Ct. at 552.

In arguing that Copeland violated his clearly established rights, Thompson points to our earlier decisions in *Robinson v. Solano Cty.*, 278 F.3d 1007 (9th Cir. 2002) (en banc), and *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009). But neither of those cases involved a felony traffic stop with a firearm in proximity, nor did they feature facts sufficiently similar to the pattern we address here to put the

constitutional question *beyond debate* as required to defeat qualified immunity. *al-Kidd*, 563 U.S. at 741.

In *Robinson*, we held that police used excessive force in pointing their guns at a 64-year old unarmed retired police officer who had his hands up. 278 F.3d at 1010, 1015. The police were responding to a radio dispatch regarding a man "carrying a shotgun," who had just shot two dogs, and who was in the street "yelling at this time." *Id.* at 1010. After six police vehicles arrived on the scene in broad daylight, Robinson voluntarily approached from his yard in an unbuttoned shirt and jeans. *Id.* The officers saw that he was clearly unarmed—a shotgun was nowhere in sight. *Id.* at 1010, 1014. The police presence was overwhelming. And although the officers released Robinson within thirty minutes when it was ascertained he had not violated the law, the potential crime was at most a misdemeanor, in contrast to Thompson's felony arrest. *Id.* at 1010–11, 1014.

In *Hopkins*, officers used excessive force when they broke into the home of an unarmed man who had been in a minor traffic accident and was suspected of drunk driving, arrested him, and pointed their guns at him. 573 F.3d at 759, 776. Citing to *Robinson*, we held that "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger." *Id.* at 776 (citing *Robinson*, 278 F.3d at 1015). We confirmed that force can be excessive where the "crime under investigation [is] at most a misdemeanor[,] the suspect [is] apparently unarmed and approaching the officers in a peaceful way," there "[are] no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumber[] the plaintiff." *Id.* (citation and internal quotation marks omitted). Again, the potential crime in

*Hopkins* was not a felony and there were no apparent dangerous or exigent circumstances.

The arrest in *Hopkins* occurred in his bedroom, within the sanctuary of his own home, where "searches and seizures . . . without a warrant are presumptively unreasonable." 573 F.3d at 773 (9th Cir. 2009) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).  Robinson approached from "the area immediately surrounding and associated with [his] home," which "enjoys protection as part of the home itself." *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013).  Though the distance from his house—which was in a rural area—to the street was 135 feet, Robinson was in the "area around the home to which the activity of home life extends." *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984).[4]

The Supreme Court "has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment." *S. Dakota v. Opperman*, 428 U.S. 364, 367 (1976).  Indeed, the Court has recognized that traffic stops are "especially fraught with danger to police officers." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (citation and internal quotation marks omitted).  As the government points out, traffic stops and arrest situations "amount[ed] to a combined total of 27.1% of assaults against

---

[4] Similarly, Thompson's reliance on *Sandoval v. Las Vegas Metropolitan Police Department* is misplaced.  756 F.3d at 1159, 1165. In *Sandoval*, which we decided in 2014, a police officer used excessive force when he entered a home without a warrant, using errant information, and pointed a gun at an unarmed teenager suspected of having possibly committed a misdemeanor burglary.  *Id.*  The law was clearly established that "[b]ursting through the back door unannounced with guns drawn" and pointing a gun at the teenager's head was neither necessary nor reasonable.  *Id.* at 1165 (citation omitted).

officers . . . , and a combined total [of] 35.6% of situations leading to an officer's felonious death, from 2006–2015."

Perhaps because of the considerable danger inherent in the traffic stop context, the Supreme Court has stressed that the "risk of harm to both the police and the occupants [of a stopped vehicle] is minimized . . . if the officers routinely exercise unquestioned command of the situation." *Johnson*, 555 U.S. at 330 (citation and internal quotation marks omitted). And the Court has "expressly recognized that suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed." *Michigan v. Long*, 463 U.S. 1032, 1048 (1983). We have recently echoed the Court's view, recognizing the "need for unquestioned obedience to lawful commands during a car stop." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 804 (9th Cir. 2014).

These precedents, many of which were decided after *Robinson* and *Hopkins*, complicate the state of the law at the time of Thompson's seizure. They also suggest that a seizure conducted during a traffic stop may be a less severe "intrusion on the individual's Fourth Amendment interests" than the same seizure conducted within the refuge of the home. *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted). The Fourth Amendment's protection is at its zenith within the home, and the area immediately surrounding and associated with the home. *Payton*, 445 U.S. at 589–90; *Jardines*, 569 U.S. at 6–7. At the same time, the special and empirical dangers traffic stops pose to police buttress the "countervailing governmental interests at stake" in employing some force to control a potentially volatile automotive arrest situation. *Graham*, 490 U.S. at 396. This distinction accords with common sense.

At the time of the gun-pointing here, Copeland was engaged in both a traffic stop and a nighttime felony arrest, and the situation was "tense, uncertain, and rapidly evolving." *Id.* at 397. Copeland was aware that Thompson had been convicted of a recent felony for possessing a firearm. There were only two deputies on the scene—as opposed to *Robinson* where six police vehicles fortified the officers with overwhelming force. 278 F.3d at 1010. Thompson was heavier and taller than Copeland. And critically, Thompson was within seconds of a firearm—unlike the plaintiffs in *Robinson* and *Hopkins* where no guns were anywhere in the vicinity at the time of the gun-pointing. The circumstances Copeland faced "would have alarmed any officer." *Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (9th Cir. 1995). After careful scrutiny of the record, we are not persuaded that Copeland was "plainly incompetent" or that he "knowingly violate[d] the law" when he acted as he did. *See Pauly*, 137 S. Ct. at 551 (citation and internal quotation marks omitted).

The only traffic stop case Thompson points to involved markedly different facts. *See Green*, 751 F.3d at 1039. Police officers stopped an African-American woman after a system they used to run license plates malfunctioned, leaving them with the completely mistaken belief that the woman had stolen the car she was driving. *Id.* at 1042. The officers failed to verify whether the car was stolen, even though they had ample opportunity to do so. *Id.* at 1043. At least four officers pointed guns at the woman without reasonable suspicion or probable cause that she had committed *any* crime. *Id.* at 1043, 1044. There was no weapon anywhere nearby, and the woman suffered from knee problems, stood five feet and six inches tall, and weighed 250 pounds. *Id.* at 1043. That scenario, which

merited denial of qualified immunity, contrasts starkly with this case.

While Thompson fails to carry his burden that, in view of the safety concerns faced in this traffic stop, every reasonable police officer would have known that Copeland's conduct was unconstitutional under these circumstances, we acknowledge that the facts of this case are at the outer limit of qualified immunity's protection in the excessive force context. There can be little question that holding the gun in the low-ready alternative would have been a superior option for Copeland to use in the circumstances here, rather than pointing it at Thompson's head. In the face of the then-current law, there was not a clearly established constitutional violation. Going forward, however, the law is clearly established in this scenario.

## Conclusion

Because the law was not clearly established within the parameters dictated by the Supreme Court, Copeland is entitled to qualified immunity and the grant of summary judgment is **AFFIRMED**.

---

CHRISTEN, Circuit Judge, dissenting:

The majority decides Deputy Copeland is entitled to qualified immunity on Lawrence Thompson's excessive force claim because Thompson's right not to have a gun pointed at his head was not clearly established in 2011, when the events of this case took place. This decision squarely conflicts with the clear directive our court issued in *Robinson v. Solano County*, a case involving facts that, if distinguishable at all, posed a greater threat to officer safety.

We specifically took *Robinson* en banc "to clarify the law of the circuit on the scope of qualified immunity for excessive force claims," 278 F.3d 1007, 1009 (9th Cir. 2002) (en banc), and *Robinson*'s holding was plain: an officer who points his gun at the head of an arrestee who is cooperative and unthreatening, outnumbered by police, and apparently unarmed, violates the Fourth Amendment. *Id.* at 1015. If the contours of this right were not clearly established before we decided *Robinson*, they most certainly were thereafter. *See id.* Today's decision regrettably muddies *Robinson*'s clear dictates, but it cannot overturn sixteen years of precedent. Because our three-judge panel is bound to abide by *Robinson*, I respectfully dissent.

## I.

Notably, the court and I read the undisputed factual record the same way: Thompson's case arose on the evening of December 10, 2011, when Deputy Copeland was on patrol in the City of Burien. Deputy Copeland signaled Thompson to pull over to the side of the road after observing Thompson's failure to stop at an intersection limit line and turning without signaling a full 100 feet before initiating a turn. Thompson pulled over and immediately apologized to Deputy Copeland for the traffic infractions. He did not have his license with him but he gave his name and corroborated his identification with a business envelope that was addressed to him. Deputy Copeland ran Thompson's name through a computer and learned that Thompson's license had been suspended for an unpaid ticket, and that he had a felony conviction for unlawful possession of a firearm. Deputy Copeland decided to arrest Thompson for driving with a suspended license in the third degree, a misdemeanor, *see* Wash. Rev. Code § 46.20.342(c), and called for backup. After Deputy Fitchett arrived on the scene, Deputy Copeland

asked Thompson to step out of the car and patted him down to verify that he was unarmed.  Finding no weapons, Deputy Copeland directed Thompson to sit on the bumper of his patrol car under Deputy Fitchett's supervision while Deputy Copeland began an inventory search of the vehicle Thompson had been driving.[1]

We must construe the events that followed in the light most favorable to Thompson.  *See Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1263 (9th Cir. 2015). Thompson alleges he remained seated calmly on the patrol car's bumper while Deputy Copeland searched his car, which was located 10 to 15 feet away.  The State does not deny that Thompson was calm and cooperative.  There is no allegation that Thompson was behaving erratically or threateningly, nor that Thompson was anything but fully compliant with the officers' directives as he sat on the bumper of the patrol car.  The parties also agree that during his search of the vehicle, Deputy Copeland noticed a gun inside a plastic grocery bag on the rear passenger floorboard.

The parties dispute what happened next.  Deputy Copeland averred that he unholstered his weapon, held it in the low-ready position, and ordered Thompson to lie face-down on the ground.  According to Thompson, Deputy Copeland unholstered his weapon, pointed it at Thompson's head, and threatened to kill him if he made a wrong move. In response, Thompson immediately lay on the ground and "did not resist in any way."  Deputy Copeland handcuffed

---

[1] Thompson, a self-employed mechanic, had just finished repairing the car and was taking it for a test-drive when Deputy Copeland stopped him.

Thompson without incident and re-arrested him, this time for being a felon in possession of a firearm.

A Washington Superior Court judge found that Thompson was stopped for pretextual reasons, in violation of the Washington State Constitution. The judge also found Deputy Copeland's decision to impound Thompson's car was a pretext to search for evidence and dismissed the charges against him.

## II.

The circumstances in Thompson's case plainly justified the display of some degree of force. Deputy Copeland knew Thompson had a prior felony conviction for unlawful possession of a firearm, saw a gun in the backseat of the car Thompson had been driving, and suddenly found himself in the unenviable position of having to effectuate an arrest of a felon-in-possession. Thompson acknowledges, and I fully agree, that it would not have been unreasonable for Deputy Copeland to unholster his gun and hold it in the low-ready position. But there is a world of difference between unholstering a weapon as a display of force while commanding a suspect to submit to arrest, and threatening to kill someone while pointing a gun at their head. Our Fourth Amendment jurisprudence, specifically our en banc decision in *Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002) (en banc), drew this line over a decade ago. Even if officers previously thought pointing a gun at an unarmed, unthreatening citizen was a show of force only nominally more severe than holding a gun in the low-ready position, *Robinson* declared that the former has irrefutable constitutional consequences. Today, the court ignores this critical distinction and regrettably blurs the guidance *Robinson* provided.

Determining whether officers employ unreasonable force in effectuating an arrest requires "careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Under some circumstances, the Fourth Amendment permits officers to display or employ deadly force. *See, e.g.*, *Wilkinson v. Torres*, 610 F.3d 546, 552–53 (9th Cir. 2010) (concluding officer was justified in use of deadly force to protect fellow officer from harm); *Long v. City & Cty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (concluding officer was justified in use of deadly force where armed, agitated suspect threatened to shoot); *Blanford v. Sacramento Cty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (concluding officers were justified in use of deadly force where armed suspect ignored their warnings and commands to stop). Courts face a difficult task in deciding where a particular factual circumstance falls on the spectrum between reasonable and unreasonable force, and we must always assess the force actually employed from the perspective of a reasonable officer on the scene, rather than with the benefit of 20/20 hindsight. *See Graham*, 490 U.S. at 396–97. That said, in 2002 our en banc court declared the force used in *Robinson* was unreasonable. Construing the facts here in the light most favorable to Thompson, I see no principled way to distinguish Thompson's case from Robinson's.

In *Robinson*, a neighbor called to report that the plaintiff had shot two of her dogs and was "in the middle of the street yelling at this time." *Robinson*, 278 F.3d at 1010. When officers arrived outside Robinson's property shortly thereafter, he approached them. *Id.* As he walked the 135 feet from his front door to where officers stood in the street, Robinson identified himself by name and acknowledged that he was indeed the subject of the neighbor's call to the police. *Id.* That gave the officers good

reason to believe he had just used a gun. Robinson appeared unarmed, but the officers had not had a chance to do a pat-down to verify that he was.[2] *Id.* at 1011, 1014. From about six feet away, one officer pointed a gun at Robinson's head and instructed him to put his hands above his head; another officer also unholstered his gun and pointed it at Robinson. *Id.* at 1010. As Robinson was raising his hands, the first officer repeated his command, stepped forward, and thrust his gun to within three or four feet of Robinson's head. *Id.* Robinson was then handcuffed and put in the back of a patrol car. *Id.*

Robinson's jury deadlocked over whether the force the officers employed to seize him was reasonable, but the district court granted the officers' Rule 50 motion for judgment as a matter of law on the excessive force claim, ruling that the officers were entitled to qualified immunity. *Id.* at 1011. A three-judge panel of our court disagreed and held that the officers were not entitled to qualified immunity because the law governing excessive force was sufficiently clear to put a reasonable officer on notice that pointing a gun at Robinson's head violated his constitutional rights. *Id.*

We took *Robinson* en banc for the express purpose of clarifying our court's standard for constitutionally excessive force and the scope of qualified immunity available in the oft-repeated scenario that confronts officers effectuating arrests of suspects who, like Robinson and Thompson, are neither in cars nor otherwise situated where they might have access to weapons. *Id.* at 1009. En banc, we observed that Robinson was apparently unarmed, outnumbered, and approaching officers peacefully; there were no "dangerous

---

[2] In fact, Robinson had a four-inch utility knife strapped to his belt. *Robinson*, 278 F.3d at 1011.

or exigent circumstances apparent at the time of the detention" that justified aiming a gun at his head. *Id.* at 1014. Even though Robinson was believed to have recently used a gun and was not definitively known to be unarmed, we concluded that the officers' threatened use of lethal force was excessive and in violation of the Fourth Amendment. *Id.* at 1013–14. Nevertheless, we affirmed the district court's holding that the officers were entitled to qualified immunity because Fourth Amendment law governing the officers' conduct was not clearly established when Robinson was arrested. *Id.* at 1016–17.

*Robinson* was decided in 2002. It cannot be questioned that the rule from *Robinson* was clearly established when Thompson was arrested in 2011.

Today, the court agrees that Deputy Copeland used unconstitutionally excessive force. It also agrees that, going forward, qualified immunity should not be available to officers who point guns at suspects under similar circumstances. Yet the court grants Deputy Copeland qualified immunity. It does so by concluding that, until now, the law had not made it clear to an officer in Deputy Copeland's position that pointing a gun at the suspect's head would constitute excessive force. The court offers two reasons for reaching this conclusion. Neither withstands scrutiny. First, the court likens Thompson's case to a traffic stop. That comparison would be apt if Thompson had been sitting in a car, because then a reasonable deputy might have feared that Thompson could reach a hidden weapon. But Thompson was outside of his car and well away from it, he had already been frisked, and he was under the guard of a second officer. The possibility of a secreted weapon did not justify pointing a gun at Thompson's head.

The only other justification the court offers for granting qualified immunity is its suggestion that Robinson's case did not put Deputy Copeland on notice that threatening Thompson with lethal force would be excessive because, unlike Thompson, Robinson was "approach[ing] from the area immediately surrounding . . . his home" when officers pointed their guns at him. By citing to *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013), the court implies that Robinson was in the area the Supreme Court has designated as the "curtilage" of his home, and therefore was entitled to special Fourth Amendment protection. This is both factually and legally wrong. The Supreme Court defines the curtilage of a home as the common law did, the "area immediately adjacent to the home," *Oliver v. United States*, 466 U.S. 170, 180 (1984), that is "so associated with the activities and privacies of domestic life that [it should be] deemed . . . as *part of [the] home*," *United States v. Dunn*, 480 U.S. 294, 303 (1987) (emphasis added); *see also Jardines*, 569 U.S. at 6–7 (concluding the front porch is "the classic exemplar" of curtilage, because it "immediately surround[s] and [is] associated with the home" (internal quotation marks omitted)). Our court is not free to redefine "curtilage," and Robinson was nowhere near the curtilage of his home when he was seized. In fact, our opinion specified that he was 135 feet from his front door when he approached officers who were standing in a public street. *Robinson*, 278 F.3d at 1010.

Inevitably, there are minor factual differences between Robinson's case and Thompson's, but the Supreme Court has repeatedly instructed that a plaintiff need not identify "a case directly on point" for a right to be clearly established. *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citing *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "If qualified immunity

provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos v. Agrano*, 661 F.3d 433, 442 (9th Cir. 2011); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."); *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001) ("Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."). The question is whether existing precedent "placed the statutory or constitutional question beyond debate," *Mullenix*, 136 S. Ct. at 308, such that a reasonable officer in the defendant's position would have known his behavior was unlawful, *see White*, 137 S. Ct. at 551.

Here, factual differences between Thompson's case and Robinson's only underscore the strength of Thompson's excessive force claim: Deputy Copeland himself patted down Thompson before he directed Thompson to sit on the bumper of the patrol car. Thompson's affect was calm, he was under the supervision of another officer, he was seated at least 10 to 15 feet away from the vehicle he had been driving—and at least that far from the gun on its rear floorboard. Like Robinson, Thompson was outnumbered by officers. He was apologetic and uncombative. There were "no dangerous or exigent circumstances apparent at the time of the detention," *Robinson*, 278 F.3d at 1014, nor any allegation that Thompson was behaving erratically. *Robinson* provided fair notice that pointing a gun at a suspect's head under these circumstances—where a fully compliant suspect is unarmed, outnumbered, and unthreatening—violates the Fourth Amendment. The court's effort to distinguish *Robinson* by suggesting that

Robinson was anywhere near the curtilage of his home erodes our en banc effort to provide a clear standard for police officers.

## III.

We must take great care to "apply the 'clearly established' rule in such a way that faithfully guards 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Mattos*, 661 F.3d at 442 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). We allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397.

Individuals who serve the public by voluntarily taking on the dangerous task of enforcing criminal laws are by no means "required by the Fourth Amendment to take unreasonable risks." *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996). And we must be mindful that police officers[3] and citizens alike have suffered the consequences of tragic mistakes made in the rapidly unfolding and chaotic circumstances that can attend arrests. For good reason, the Fourth Amendment imposes limits on the force that may be used or displayed to control a scene or subdue a suspect.

---

[3] Statistics compiled by the FBI indicate that in 2016, an estimated 66 law enforcement officials were feloniously killed in the line of duty. Federal Bureau of Investigation, *FBI Releases 2016 Preliminary Statistics for Law Enforcement Officers Killed in the Line of Duty* (May 15, 2017), https://www.fbi.gov/news/pressrel/press-releases/fbi-releases-2016-preliminary-statistics-for-law-enforcement-officers-killed-in-the-line-of-duty.

When an officer gives a command, a fearful arrestee may require a longer-than-expected interval to understand the order and follow it. *See Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1002–03 (9th Cir. 2017) (after being instructed to "drop the gun," a 13-year-old holding a toy gun did not do so immediately, but instead "paused a few seconds and began to rotate his body clockwise," prompting the officer to shoot and kill him). In the heat of the moment, officers have interpreted delayed responses as willful refusal to cooperate, or failed to realize that a suspect has been given inconsistent commands (*e.g.*, "Put your hands up!" "Don't move!"). *See, e.g.*, *C.V. ex rel. Villegas v. City of Anaheim*, 823 F.3d 1252, 1254 (9th Cir. 2016) (conflicting commands given to a suspect holding a BB gun, suspect did not immediately obey, officer shot and killed suspect). People who are frightened and confused may speak or move inadvertently, prompting even the most conscientious officer to perceive the situation as more dangerous and the suspect as more threatening than is actually the case. *See, e.g.*, *Longoria v. Pinal Cty.*, 873 F.3d 699, 703 (9th Cir. 2017) (recently tased suspect "flinched and moved erratically" and turned to put his empty hands above his head; officer fired two rounds into the suspect's back, killing him); *A. K. H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1009 (9th Cir. 2016) (officer resorted to use of deadly force almost immediately after commanding suspect to remove his hand from his pocket, fearing a heavy object in the suspect's sweatshirt pocket was a gun, when in fact it was a cell phone). Trained, well-meaning officers sometimes make mistakes, and even an additional split-second to perceive and react can save lives. *See, e.g.*, *Torres v. City of Madera*, 648 F.3d 1119, 1121 (9th Cir. 2011) (officer intending to use stun gun accidentally drew and fired pistol, killing suspect). Once a gun is aimed at a suspect's head, even an accidental slip can result in an errant, and fatal, shot. *See, e.g.*, *Stamps*

*v. Town of Framingham*, 813 F.3d 27, 31 (1st Cir. 2016) (officer pointing a gun at fully compliant suspect's head inadvertently pulled the trigger, shooting and killing him). Here, the court acknowledges that Thompson was "under control" and "not in close proximity to an accessible weapon." But when tinderbox situations do arise, emotions run high and mistakes are predictable. Even an additional fraction of a second affords suspects a greater opportunity to get their bearings and comply with commands, and officers the chance to reconsider the use of lethal force.

This court has seen an alarming number of officer shooting cases in recent years, many involving circumstances similar to those present here but with fatal results. Police departments are to be commended for acknowledging the problem and making efforts to address it,[4] as are Blue Ribbon commissions convened to determine how and why situations like this one too often escalate to involve the use or threatened use of deadly force, and to identify training tactics that reduce risks.[5] Hopefully, this

---

[4] *See* Bernard D. Rostker et al., RAND Center on Quality Policing, *Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process* at 88–89 ("Several aspects of officer training might be modified to reduce the incidence of reflexive shooting. Accidental reflexive discharges occur without an explicit decision to shoot. The officer discharges the weapon because of a problem with physical coordination or an involuntary physiological response to a stimulus or inadvertently while struggling with a suspect. . . . To prevent these types of accidental discharges, virtually all firearm-safety training . . . highlights the need to keep one's finger outside the trigger guard except when actually firing the weapon.").

[5] The President's Task Force on 21st Century Policing recommended increased training on how to use de-escalation techniques in lieu of force when possible. *See An Evidence-Assessment of the Recommendations of the President's Task Force on 21st Century*

important work will continue.  There will always be tension between protecting individual rights and allowing officers the flexibility they need to protect the public and themselves, but the court's job is to balance officers' use of force against intrusions on individuals' Fourth Amendment rights. *Graham*, 490 U.S. at 396.  The facts of this case cannot be meaningfully distinguished from those in *Robinson*, and we have already made the judgment that on these facts the balance tips in the suspect's favor.

## IV.

*Robinson* recognized the critical distinction between pointing a gun at someone's head and holding it in the low-ready position.  Deputy Copeland was justified in displaying some degree of force, but accepting the allegations in the complaint as true, he unquestionably used excessive force when he aimed his gun at Thompson's head and threatened that if Thompson moved, he'd be dead.  Because that rule was clearly established long before Thompson was arrested, I respectfully dissent.

---

*Policing* at 13, http://www.theiacp.org/Portals/0/documents/ICPR/IAC P%20GMU%20Evidence%20Assessment%20Report%20FINAL.pdf. And in response to several high-profile police-involved shooting incidents and to this court's caselaw, the San Francisco Police Department amended its department general orders to elevate drawing and pointing a firearm at a person (even without discharge) to a reportable use-of-force instance.  *See* Report of the Blue Ribbon Panel on Transparency, Accountability, and Fairness in Law Enforcement at 63, 65, http://sfdistrictattorney.org/sites/default/files/Document/BRP_re port.pdf (citing *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528 (9th Cir. 2010)).